07 CV 2762

JUDGE BAER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— :
:
SECURITIES AND EXCHANGE COMMISSION, :
:
Plaintiff, :
:
-against- :
:          07 CV ____ (    )
:
ALEXIS AMPUDIA, :
a/k/a ALEXIS GEANCARLOS AMPUDIA NAVALO, :
a/k/a ALEXIS EMIAS, a/k/a ALEXIS ROJAS, :
:
Defendant. :
:
:
———————————————————— :


MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S EMERGENCY *EX PARTE* APPLICATION FOR TEMPORARY
RESTRAINING ORDER, ORDER TO SHOW CAUSE,
PRELIMINARY INJUNCTION, ASSET FREEZE AND OTHER RELIEF


MARK K. SCHONFELD (MS-2798)
REGIONAL DIRECTOR
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center, Suite 400
New York, New York 10281-1022
Tel: (212) 336-0175 (Szczepanik)

## TABLE OF CONTENTS

PAGE

I.    PRELIMINARY STATEMENT ....................................................................................1

II.   STATEMENT OF FACTS.........................................................................................3

A.    The Defendant .................................................................................................3

B.    Ampudia's Fraudulent Scheme ......................................................................3

    1.    Ampudia Engaged in Identity Theft and Fraudulently
        Opened Victims' Brokerage Accounts ...............................................3

    2.    Ampudia Purchased Securities in the Victims' Brokerage Accounts to Run
        Market Manipulations........................................................................4

C.    Ampudia's Fraudulent Conduct is Ongoing ...................................................7

III.  ARGUMENT ............................................................................................................7

A.    Ampudia Should be Temporarily Restrained and Preliminarily Enjoined From
    Further Violations of the Federal Securities Laws ..........................................7

    1.    The Commission is Substantially Likely to Succeed in Establishing that
        Ampudia Violated Section 17(a) of the Securities Act and Section 10(b) of
        the Exchange Act and Exchange Act Rule 10b-5 ...............................8

        a.    Ampudia Engaged in Manipulative Conduct...............................9

        b.    Ampudia Acted With Scienter ..................................................11

    2.    Ampudia Is Likely To Continue His Illegal Conduct ..........................12

B.    The Court Should Grant Additional Relief to Facilitate the Preservation Of Assets
    and the Just Administration of the Case ........................................................13

    1.    The Court Should Enter an Asset Freeze
        and Repatriation Order to Protect Funds ..........................................13

    2.    The Court Should Order an Accounting ............................................16

    3.    The Court Should Enter an Order Permitting Expedited Discovery and
        Prohibiting the Destruction of Documents .......................................17

IV.   CONCLUSION ............................................................................................................18

## TABLE OF AUTHORITIES
### <u>CASES</u>

<u>Aaron v. SEC</u>, 446 U.S. 680 (1980) ....................................................................9

<u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185 (1976) ...................................9, 11

<u>Hecht Co. V. Bowles</u>, 321 U.S. 321 (1944)............................................................8

<u>Herman & MacLean v. Huddleston</u>, 459 U.S. 375 (1983) ...............................11

<u>IIT, Int'l Inv. Trust v. Cornfeld</u>, 619 F.2d 909 (2d Cir. 1980)...........................9

<u>International Controls Corp. v. Vesco</u>, 490 F. 2d 1334 (2d Cir. 1974) .........................14

<u>Santa Fe Indus., Inc. v. Green</u>, 430 U.S. 462 (1977) .......................................10

<u>SEC v. American Bd. Of Trade, Inc.</u>, 830 F.2d 431 (2d Cir. 1987) ................15

<u>SEC v. AmerisSoft Corp.</u>, 2002 U.S. Dist. LEXIS 15237 (S.D.N.Y. Aug. 16, 2002) .................16

<u>SEC v. Cavanagh</u>, 2004 U.S. Dist. LEXIS 13372 (S.D.N.Y. Jul. 15, 2004)............................9, 10

<u>SEC v. Cavanagh</u>, 1 F. Supp. 2d 337 (S.D.N.Y. 1998) ....................................16

<u>SEC v. Cavanagh</u>, 155 F.3d 129 (2d Cir. 1998) ..................................8, 12, 14

<u>SEC v. Commonwealth Chem. Secs., Inc.</u>, 574 F.2d 90 (2d Cir. 1978)...........................12

<u>SEC v. Credit Bancorp, Ltd.</u>, 290 F.3d 80 (2d Cir. 2002) ..............................16

<u>SEC v. Gonzalez de Castilla</u>, 145 F. Supp. 2d 402 (S.D.N.Y. 2001) .............15

<u>SEC v. Grand Logistic, S.A. et al.</u>, Civ. Action No. 06-15274 (S.D.N.Y. Dec. 19, 2006) .............7

<u>SEC v. Grossman</u>, No. 87 Civ. 1031, 1987 U.S. Dist. LEXIS 1666 (S.D.N.Y. Feb. 17, 1987) .............................................................................14, 15

<u>SEC v. Heden</u>, 51 F. Supp. 2d 296 (S.D.N.Y. 1999)........................................15

<u>SEC v. Kamardin</u>, Civ. Action No. 8:07-CV-159-T24MAP (M.D. Fla. Jan. 25, 2007)................................................................................7

<u>SEC v. Kimmes</u>, 799 F. Supp. 852 (N.D. Ill. 1992), <u>aff'd sub nom. SEC v. Quinn</u>, 997 F.2d 287 (7th Cir. 1993) ................................................................10

SEC v. Management Dynamics, Inc., 515 F.2d 801 (2d Cir. 1975)...........................................8, 12

SEC v. Mandaci, 2004 U.S. Dist. LEXIS 19143 (S.D.N.Y. Sep. 27, 2004) .................................10

SEC v. Manor Nursing Cntrs., Inc., 458 F.2d 1082 (2d Cir. 1972)...............................................14

SEC v. Margolin, No. 92 Civ. 6307, 1992 U.S. Dist. LEXIS 14872
(S.D.N.Y. Sept. 30, 1992)...................................................................................................15, 16

SEC v. Marimuthu et al., Civ. Action No. 8:07-CV-94 (D. Neb. Mar. 12, 2007) ...........................7

SEC v. Moran, 944 F. Supp. 286 (S.D.N.Y. 1996)......................................................................13

SEC v. One or More Unknown Traders et al., Civ. Action No. 1:07-CV-00431
(D.D.C. Mar. 6, 2007).............................................................................................................7

SEC v. Shiv, 379 F. Supp. 2d 609 (S.D.N.Y. 2005).....................................................................16

SEC v. Unifund SAL, 910 F.2d 1028 (2d Cir. 1990).........................................................14, 15, 17

SEC v. U.S. Envtl., 82 F. Supp. 2d 237 (S.D.N.Y. 2000) ..............................................................10

SEC v. Vaskevitch, 657 F. Supp. 312 (S.D.N.Y. 1987) ..........................................................14, 16

SEC v. Zandford, 535 U.S. 813 (2002) ......................................................................................11

SEC v. Zubkis, 2003 U.S. Dist. Lexis 16152 (S.D.N.Y. Sep. 11, 2003)........................................17

Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6 (1971) ........................10

U.S. v. Gutierrez, 181 F. Supp. 2d 350 (S.D.N.Y. 2002) .............................................................12

U.S. v. Naftalin, 441 U.S. 768 (1979)..........................................................................................9

## STATUTES AND RULES

15 U.S.C. §77q(a) ........................................................................................................................9

15 U.S.C. § 77t(b) .....................................................................................................................7, 8

15 U.S.C. § 77t(d)(2)(C) .............................................................................................................13

15 U.S.C. § 78j(b).........................................................................................................................9

15 U.S.C. § 78u(d) ....................................................................................................................7, 8

15 U.S.C. § 78u(d)5 .................................................................................14

15 U.S.C. § 77u(d)(3)(B)(iii) ...................................................................13

17 C.F.R. § 201.1001 ...............................................................................13

17 C.F.R. § 240.10b-5 ...............................................................................9

Pursuant to Federal Rule of Civil Procedure 65(b) and the federal securities laws cited herein, Plaintiff Securities and Exchange Commission ("Commission") respectfully submits this Memorandum of Law in support of its *ex parte* Emergency Application for Temporary Restraining Order, Order to Show Cause, Preliminary Injunction, Asset Freeze and Other Relief against the Defendant Alexis Ampudia, also known as Alexis Geancarlos Ampudia Navalo, Alexis Emias and Alexis Rojas ("Ampudia or the "Defendant"). The Commission seeks this relief because, as alleged in its Complaint and as explained below, there is sufficient evidence to conclude that the Defendant has violated, and will likely continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b5.

## I.
## PRELIMINARY STATEMENT

This is an application for emergency relief to halt an ongoing scheme involving the unauthorized opening of online brokerage accounts in the names of identity theft victims and the fraudulent purchase and sale of securities from those accounts. Since at least November 2006, Ampudia has stolen the identities of at least eight individuals (the "Victims") and opened at least nine online brokerage accounts in the names of the Victims (the "Victims' Brokerage Accounts") without their knowledge or consent. During the course of the scheme, Ampudia withdrew at least $1,038,250 from the Victims' bank accounts and deposited the funds into the Victims' Brokerage Accounts. Ampudia used the funds to purchase shares of thinly-traded securities to increase the prices of the securities and create artificial demand for those securities. Ampudia then sold his personal holdings of the particular securities, which he had previously purchased at

cheap prices, into the manipulated market for a profit. Ampudia utilized this scheme to manipulate the market for the securities of at least five different companies and has made at least $140,000 in unlawful profits.

The Commission seeks this immediate *ex parte* relief because Ampudia is engaged in an ongoing fraud involving identity theft and the manipulation of securities trading in online brokerage accounts of unsuspecting victims. Emergency relief is warranted to halt Defendant's scheme to prevent the further theft of identities and funds by Ampudia. The Commission seeks to freeze Ampudia's assets in order to preserve the proceeds of his illicit scheme and allow for any disgorgement of ill-gotten gains, penalties and prejudgment interest the Court may impose. Such a freeze will preserve the status quo pending the Court's determination of the Commission's request for relief.

To prevent further injury to the public, the Commission seeks an order: (a) temporarily restraining and preliminarily enjoining the Defendant from future violations of the antifraud provisions of the Securities Act and the Exchange Act; (b) freezing and repatriating the Defendant's assets; (c) requiring the Defendant to submit a verified accounting; and (d) allowing expedited discovery and preventing the destruction of documents. For the following reasons, and the reasons set forth in the accompanying declarations and exhibits appended thereto, the Court should grant the Commission's motion.

## II.
## STATEMENT OF FACTS[1]

**A.    The Defendant**

**Alexis Ampudia**, age 22, is a resident of Brooklyn, New York, and a citizen of Panama.

**B.    Ampudia's Fraudulent Scheme**

**1.    Ampudia Engaged in Identity Theft and Fraudulently Opened Victims' Brokerage Accounts**

Ampudia's fraudulent scheme is a combination of an identity theft scam with a market manipulation scheme, in which Ampudia manipulated the price of securities upward through the purchase of thinly-traded securities in order to dump his own securities at artificially inflated prices. (Krause Decl. ¶¶ 16-17.) From at least November 2006, Ampudia has stolen identification information of the Victims and used that information to unlawfully access their personal bank accounts. (Id. at ¶ 16 & Exs. 2-7) Via telephone and Internet, Ampudia posed as the Victims and caused their respective banks to wire a total of $1,038,250 from the Victims' bank accounts to the Victims' Brokerage Accounts that Ampudia had created at TD Ameritrade, Inc., Scottrade, Inc., Banc of America Investment Services Inc. and Wells Fargo Investments, LLC. (Id. at ¶¶ 6, 56 & Ex. 1.) Ampudia opened the Victims' Brokerage Accounts without the Victims' knowledge or consent. (Id. at ¶ 56 & Exs. 2-7.)

---

[1] The facts set forth herein are supported by the accompanying Declaration of Doreen Krause and the exhibits appended thereto (Krause Decl.). Some of the exhibits contain redactions to protect the confidentiality of certain personal information.

2. **Ampudia Purchased Securities in the Victims' Brokerage Accounts to Run Market Manipulations**

Ampudia used the Victims' Brokerage Accounts and the Victims' funds (wired from the Victims' bank accounts at Ampudia's direction) to purchase thinly-traded penny securities to create artificial demand for those securities. (Id. at ¶ 16 & Ex. 1.) Once the prices of the securities were artificially inflated, Ampudia sold his own position in those securities and reaped the illicit profits. (Id.) The scheme generally worked as follows:

- Ampudia chose a particular thinly-traded security which, in each case, traded below $.25 per share, with little or no trading volume.

- Ampudia, through his own trading account, then purchased a large position in the targeted security early in the trading day, at or near the day's opening price.

- Ampudia then caused the Victims' Accounts to enter large buy orders for the targeted security which created artificial demand and caused the targeted security's price to increase.

- As the security's price began to rise, Ampudia began to sell the shares he had purchased in his own account earlier in the day.

- By the end of the trading day, the targeted security's share price typically fell. The Victims' accounts were left holding the shares that were purchased resulting in a loss to the Victims' Accounts.

- Ampudia wired the proceeds of his fraudulent conduct to his bank accounts.

- During the relevant periods, the trading patterns for the particular securities show little or no trading volume prior to Ampudia's conduct, significant increases in price and volume on the days he traded the securities, and a significant decline in price and volume on the days following his conduct.

(Id. at ¶¶ 16, 29-54 & Ex. 1.)

For example, between November 17 and November 24, 2006, Ampudia engaged in this pattern of conduct while purchasing and selling Wendt-Bristol Health Services Corp. stock through his own account and a Victim's Brokerage Account at TD Ameritrade, Inc. (Id. at ¶¶

4

29-34.)  Wendt-Bristol Health Services Corp. is a corporation located in Columbus, Ohio.  (Id. at ¶ 29.)  Its common stock is quoted on the Pink Sheets[2] under the symbol WMDB.  (Id.)  In the 30 trading days before November 17, 2006, its average daily trading volume was 966 shares, and its closing price on November 14, 2006 (the last date on which trading occurred in WMDB stock prior to November 17, 2006), was $0.002 per share.  (Id.)

At 9:38 a.m. on November 17, 2006, Ampudia purchased 108,000 shares of WMBD at $0.005 per share, through his own brokerage account at Track Data Securities Corp. ("Track Data").  (Id. at ¶ 30 & Ex. 1.)  After Ampudia had completed his own purchases of WMDB stock, between 9:50 a.m. and 10:04 a.m., Ampudia purchased a total of 257,000 shares of WMDB stock in one of the Victim's Brokerage Accounts at TD Ameritrade, at prices ranging from $0.015 to $0.05 per share for a total of $12,225.  (Id. at ¶ 31.)

The Internet Protocol ("IP") Logs of the Victim's Brokerage Account show that the account was accessed on that day by a computer linked to Ampudia's home address.[3]  (Id.)  While Ampudia was purchasing WMDB stock in the Victim's Brokerage Account, at 10:00 a.m., he sold all 108,000 shares of WMDB stock at $0.05 per share, through his Track Data account.  (Id. at ¶ 32 & Ex. 1.)  Ampudia used the same computer to trade in the Victim's Brokerage Account as he did to trade in his own account.  (Id. at ¶ 27.)

---

[2]  The "Pink Sheets" is an electronic quotation system that displays quotes from broker-dealers for many of the over-the-counter (OTC) securities.  Market Makers and other brokers who buy and sell OTC securities, can use the Pink Sheets to publish their bid and ask quotation prices.

[3]  Internet Protocol is a method through which computers communicate over the Internet.  Each computer has a unique identifier (i.e., an IP Address) that distinguishes it from other computers. Computers leave a "fingerprint" on the Internet on what are called "IP Logs," which capture he date and time at which a specific computer accessed a specific location on the Internet.

The price of WMDB reached an intra-day high of $0.06 per share.  (<u>Id.</u> at ¶ 33.)  By the end of the day, WMDB's price had fallen to close at $0.03 per share.  (<u>Id.</u>)  Total volume for the day was 598,600 shares.  (<u>Id.</u>)  Ampudia repeated this conduct in WMDB on November 22, 2006 and on November 24, 2006 (using a different Victim's Brokerage Account at TD Ameritrade). (<u>Id.</u>)  As a result of Ampudia's manipulative trading in WMDB securities, he obtained approximately $31,947.09 in illicit profits.  (<u>Id.</u> at ¶ 34 & Ex. 1.)

In addition to trading in Wendt-Bristol stock, Ampudia engaged in a similar scheme in the stocks of Carematrix Corp., Atomic Burrito Inc, Micro-Integration Corp. and the warrants of Locateplus Holdings Corp.[4]  (<u>Id.</u> at ¶¶ 35-53.)  Each of these securities were thinly-traded, low price securities, and the trading patterns of each show extremely high price and volume fluctuations on the days that Ampudia bought and the sold the securities.  (<u>Id.</u> at ¶¶ 35-53 & Ex. 1.)  As a result of Ampudia's fraudulent scheme, he obtained at least $140,000 in unlawful profits.  (<u>Id.</u> at ¶ 56 & Ex. 1.)  Also as a result of his scheme, the brokerage industry has suffered financial losses.  By virtue of the Defendant's actions, the online broker-dealers at whom Ampudia fraudulently opened brokerage accounts suffered losses in excess of $269,704 by unwittingly providing the equity for the Defendant's unauthorized trades in the fraudulent accounts.  (<u>Id.</u> at ¶ 57 & Exs. 2-7.)  The instant action is the latest in a series of enforcement

---

[4] The stocks of Wendt-Bristol, Carematrix Corp., Atomic Burrito Inc. are traded on the Pink Sheets.  The warrants of Locateplus Holdings Corp. are traded on the OTC-Bulletin Board. (Krause Decl. ¶¶ 29, 35, 41, 48, 51.)

actions recently brought by the Commission in its ongoing effort to halt this the rapidly-growing fraud involving identity theft and account intrusions.[5]

### C.    Ampudia's Fraudulent Conduct is Ongoing

Ampudia's fraudulent conduct is ongoing.  As recently as March 21, 2007, Ampudia's trading records show conduct similar to that described above with respect to the thinly-traded securities of additional companies.  (Id. at ¶ 54.)  Based upon Ampudia's pattern of conduct, Ampudia's recent trading activity suggests that he has taken control of additional identity theft victims' accounts to create additional demand in other thinly-traded securities.  (Id. at ¶¶ 47-54.)

### III.
### ARGUMENT

### A.    Ampudia Should be Temporarily Restrained and Preliminarily Enjoined from Further Violations of the Federal Securities Laws

Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act set forth the standard for issuing an injunction sought by the Commission:

> Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices [constituting] a violation of [the] provisions of this title, … [the Commission] may, in its discretion, bring an action … to enjoin such acts or

---

[5] See, e.g., SEC v. Marimuthu et al., Civ. Action No. 8:07-CV-94 (D. Neb. Mar. 12, 2007) (Commission charged defendants with participating in scheme to manipulate the prices of at least fourteen securities through unauthorized use of other people's online brokerage accounts); SEC v. One or More Unknown Traders et al., Civ. Action No. 1:07-CV-00431 (D.D.C. Mar. 6, 2007) (Commission obtained TRO and asset freeze against defendants who combined electronic intrusions into online brokerage accounts with traditional market manipulation); SEC v. Kamardin, Civ. Action No. 8:07-CV-159-T24MAP (M.D. Fla. Jan. 25, 2007) (Commission charged defendant with commandeering online trading accounts to run market manipulations); SEC v. Grand Logistic, S.A. et al., Civ. Action No. 06-15274 (S.D.N.Y. Dec. 19, 2006) (Commission obtained TRO, asset freeze and repatriation order against Estonian brokerage firm that provided intruders access to U.S. exchanges to conduct market manipulations in the securities of at least twenty-five companies).

practices, and upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d).  Because the SEC is "not . . . an ordinary litigant, but . . . a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," its burden to secure temporary or preliminary relief is less than that of a private party. SEC v. Management Dynamics, Inc., 515 F.2d 801, 808 (2d Cir. 1975).  Thus, "the standards of public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief."  Hecht Co. v. Bowles, 321 U.S. 321, 331 (1944).  In particular, the Commission need not show risk of irreparable injury or the lack of an adequate remedy at law. Management Dynamics, 515 F.2d at 808.

Rather, the Commission is entitled to entry of temporary and preliminary injunctive relief against future securities law violations upon "a substantial showing of likelihood of success as to both a current violation and the risk of repetition."  SEC v. Cavanagh, 155 F.3d 129, 132 (2d Cir. 1998); see also 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d).  Here, the Commission can easily meet its burden of making a "substantial showing" that (i) the Defendant has committed current violations of the antifraud provisions of the federal securities laws, and (ii) there is a risk that the Defendant will repeat his conduct by continuing the fraud alleged in the Complaint through further identity theft and market manipulation.

**1.    The Commission is Substantially Likely to Succeed in Establishing that Ampudia Violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5**

The Commission has alleged in its Complaint violations of the antifraud provisions of the Exchange Act and the Securities Act.  There is a substantial likelihood that the Commission will succeed in establishing each of these violations.

8

Section 17(a) of the Securities Act prohibits fraudulent conduct by any person in the offer or sale of securities; Section 10(b) of the Exchange Act and Rule 10b-5 thereunder generally prohibit fraud in connection with the purchase or sale of a security (collectively, the "antifraud provisions"). 15 U.S.C. §77q(a); 15 U.S.C §78j(b); 17 C.F.R. § 240.10b-5; see also United States v. Naftalin, 441 U.S. 768, 772-773 (1979).  Specifically, these provisions make it unlawful, in connection with the offer, purchase or sale of securities, to:  (i) employ any device, scheme or artifice to defraud; (ii) make any untrue statement of material fact or omit to state material facts necessary to make the statements made not misleading; or (iii) engage in any transaction, practice or course of business that operates as a fraud or deceit.  See Aaron v. SEC, 446 U.S. 680, 687-88 (1980).

In addition, to establish a violation of the antifraud provisions, the Commission will be required to show that the Defendant acted with scienter.  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 201 (1976).[6]  Scienter has been defined as a "mental state embracing the intent to deceive, manipulate or defraud."  Id. at 201 n.12.  Reckless conduct satisfies the scienter requirement. IIT, Int'l Inv. Trust v. Cornfeld, 619 F.2d 909, 923 (2d Cir. 1980).

### a.    Ampudia Engaged in Manipulative Conduct

Stock market manipulation is the "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities."  Ernst, 425 U. S. at 199.  "The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and

---

[6]  Scienter is a necessary element of a violation of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  Ernst, 425 U.S. at 193. However, the Commission need not show scienter to establish violations of Sections 17(a)(2) and (3) of the Securities Act.  Aaron, 446 U.S. at 696-97.

9

demand, not rigged by manipulators." SEC v. Cavanagh, 2004 U.S. Dist. LEXIS 13372, *82

(S.D.N.Y. Jul. 15, 2004) (quoting Gurary v. Winehouse, 190 F.3d 37, 45 (2d Cir. 1999)).  The

antifraud provisions prohibit stock market manipulation.  See Santa Fe Indus., Inc. v. Green, 430

U.S. 462, 476 (1977); SEC v. U.S. Envtl., 82 F. Supp. 2d 237, 239 (S.D.N.Y. 2000); cf. SEC v.

Kimmes, 799 F. Supp. 852, 859 (N.D. Ill. 1992), aff'd sub nom. SEC v. Quinn, 997 F.2d 287

(7th Cir. 1993) ("[A]ny activities that falsely persuade the public that activity in an over-the-

counter security is 'the reflection of a genuine demand instead of a mirage' are outlawed by 1933

Act § 17(a) and 1934 Act § 10(b).").

     Ampudia violated the antifraud provisions of the federal securities laws by fraudulently

opening brokerage accounts in the names of the Victims, funding those accounts with money he

stole from the Victims' bank accounts, and using the Victims' Brokerage Accounts to purchase

securities for the purpose of creating artificial demand in those securities and increasing the price

of those securities.  (Krause Decl. ¶¶ 16-17.)  Specifically, with respect to his manipulation,

Ampudia purchased thinly-traded securities in his own accounts at a low price; he placed orders

to purchase the same securities through the Victim's Brokerage Accounts at ever-increasing

prices; and, when the price rose, he sold his personal holdings into the market place at a

significant profit.  (Id.)  Thus, Ampudia engaged in conduct designed to deceive or to defraud

investors.[7]

---

[7] For the conduct to be assailable under the antifraud provisions, it must also be done "in
connection with" the offer, purchase or sale of securities.  See, e.g., SEC v. Mandaci, 2004 U.S.
Dist. LEXIS 19143, **28-29 (S.D.N.Y. Sep. 27, 2004).  This requirement is satisfied if the fraud
"touches" upon a securities transaction.  Superintendent of Insurance v. Bankers Life & Casualty
Co., 404 U.S. 6, 12-13 (1971).  Ampudia's purchases of securities through the brokerage
accounts he fraudulently opened for the purpose of manipulating the price and volume of various

b.    **Ampudia Acted With Scienter**

Scienter is the "mental state embracing the intent to deceive, manipulate or defraud." Ernst, 425 U.S. at 193. The law does not require direct evidence of scienter; rather, "proof of scienter required in fraud cases is often a matter of inference from circumstantial evidence." Herman & MacLean v. Huddleston, 459 U.S. 375, 390-91 n.30 (1983).

Here, Ampudia systematically looted the personal bank accounts of unsuspecting victims, established unauthorized brokerage accounts, transferred victims' funds into those brokerage accounts, and used those funds to run market manipulations of thinly-traded securities in order to profit in his own trades in those securities. (Krause Decl. at ¶¶ 16-17.) Based on overwhelming circumstantial evidence, there simply is no possible innocent explanation for Ampudia's conduct. Ampudia's intent to defraud is clear: he surreptitiously accessed the Victims' bank accounts through identity theft, and he opened the Victims' Brokerage Accounts and traded them without authorization. (Id.) The pattern and timing of Ampudia's trades in his account match up to the way Ampudia traded shares in the Victims' accounts in order to maximize his profits. (Id. at ¶¶ 29-55.) Given the nature of the securities traded by Ampudia, his scheme to date has resulted in relatively high profits over relatively short periods of time. (Id. at ¶ 56.) These facts

_____

securities he purchased and sold in his own accounts easily meets the "in connection with" standard, as the very transactions themselves are the essence of his fraud – the scheme was employed solely for the purpose of trading in securities. See SEC v. Zandford, 535 U.S. 813, 824-25 (2002) ("in connection with" requirement met if the scheme to defraud and the sale of securities coincide).

provide more than ample circumstantial evidence that Ampudia is intentionally conducting a fraudulent scheme. See U.S. v. Gutierrez, 181 F. Supp. 2d 350, 354& n.6 (S.D.N.Y. 2002) (citing cases).

### 2.    Ampudia Is Likely To Continue His Illegal Conduct

In determining whether to grant emergency relief, courts consider the likelihood that, unless enjoined, a defendant will violate the securities laws again. Cavanagh, 155 F.3d at 135. As the Second Circuit instructed in Management Dynamics, Inc.:

> Certainly, the commission of past illegal conduct is highly suggestive of the likelihood of future violations. . . . [F]actors suggesting that the infraction might not have been an isolated occurrence are always relevant. . . . Moreover, appellate courts have repeatedly cautioned that cessation of illegal activity does not ipso facto justify the denial of an injunction.

515 F.2d at 807. In assessing likelihood of repetition, courts also look to such factors as the character of the violation, the degree of scienter involved, whether the infraction is an isolated occurrence, and the degree to which a defendant's occupation or activities may present future opportunities to violate the law. SEC v. Commonwealth Chem. Secs., Inc., 574 F.2d 90, 100-01 (2d Cir. 1978).

The character of the Defendant's violations entailed a high degree of scienter in a fraud scheme he continues to perpetrate. Ampudia's pattern of identity theft and trading is ongoing and, based on the latest information available to the Commission, last repeated itself as recently as March 21, 2007. (Id. at ¶ 54.) Given Ampudia's repeated, frequent and recent conduct, there is a high probability that he will continue to violate the federal securities laws unless restrained and enjoined. Absent injunctive relief, nothing would prevent Ampudia from either continuing or re-commencing his conduct in other accounts.

Ampudia's conduct is egregious, deliberate, repetitive and highly deceptive. It is also highly profitable. A temporary restraining order and preliminary injunction are warranted to preserve the status quo pending the adjudication of the merits of the Commission's Complaint.

**B.     The Court Should Grant Additional Relief to Facilitate the Preservation  of Assets and the Just Administration of the Case**

The Court should order an asset freeze, repatriation of any assets moved outside the United States, and an accounting to preserve any remaining assets and to identify additional investor assets. The Court also should order expedited discovery and prohibit the destruction of documents to allow for the efficient and just administration of this action.

**1.     The Court Should Enter an Asset Freeze and Repatriation Order to Protect Funds**

In its Complaint, the Commission seeks injunctive relief, disgorgement, prejudgment interest thereon and civil penalties.[8] The ancillary remedy of a freeze of the assets of the Defendant is appropriate here in order to ensure that sufficient funds are available to satisfy any

---

[8] Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d)(3), set the standards for the imposition of civil monetary penalties. The purpose of a civil penalty is to punish the individual violator and deter future violations. See SEC v. Moran, 944 F. Supp. 286, 296-97 (S.D.N.Y. 1996) ("Disgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud.... [A]uthority to seek or impose substantial monetary penalties, in addition to the disgorgement of profits, is necessary for the deterrence of securities law violations that otherwise may provide great financial returns to the violator.") (quoting H.R. Rep. No. 101-616, 101st Cong., 2d Sess., reprinted in 1990 U.S. Code Cong. & Admin. News 1379, 1384-86). The amount of penalty is determined by the court "in light of the facts and circumstances" of the particular case. Id. In this case, the Commission seeks a third tier statutory penalty, which amounts to $130,000 for each violation. See 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii) (The statute actually sets the penalties at lower amounts; however, pursuant to the Debt Collection Improvement Act of 1996, these amounts have been adjusted for inflation. 17 C.F.R. § 201.1001.)

order of disgorgement, statutory civil penalty, or other remedy that may ultimately be imposed by the Court.  See, e.g., SEC v. Unifund SAL, 910 F.2d 1028, 1041-42 (2d Cir. 1990) (asset freeze was warranted in amount sufficient to satisfy potential judgment for disgorgement and civil penalties in insider trading case); International Controls Corp. v. Vesco, 490 F. 2d 1334, 1347 (2d. Cir. 1974) ("an asset freeze may be appropriate to assure compensation to those who are victims of a securities fraud"); SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1106 (2d Cir. 1972) (fraudulent nature of appellants' violations and uncertainty regarding amount and location of proceeds warranted asset freeze to preserve the status quo); SEC v. Grossman, 1987 U.S. Dist. LEXIS 1666, **35-36 (S.D.N.Y. Feb. 17, 1987) (freeze order may be imposed even absent a preliminary injunction); Exchange Act Section 21(d)(5), 15 U.S.C. § 78u(d)5 ("In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors.").

Indeed, an order for disgorgement or other monetary relief will often be rendered meaningless without an asset freeze during the pendency of the action.  See Grossman, 1987 U.S. Dist. LEXIS 1666, **35-36.  An asset freeze ensures that a defendant's assets, whether in the control of the defendant or its agents, are not secreted or dissipated prior to the time that disgorgement is ordered.  Cavanagh, 155 F.3d at 136 (affirming district court's asset freeze order where the freeze merely "freeze[d] the status quo"); SEC v. Vaskevitch, 657 F. Supp. 312, 315 (S.D.N.Y. 1987) ("As to the issue of an asset freeze, the court certainly has the ability to ensure that the defendants' assets are not secreted or dissipated before entry of final judgment concluding this action.").  Accordingly, courts have imposed orders freezing assets of defendants, so that, if the

Commission is ultimately successful in an enforcement action, meaningful relief for defrauded investors can be obtained. See Unifund SAL, 910 F.2d at 1041; SEC v. American Bd. of Trade, Inc., 830 F.2d 431, 438-39 (2d Cir. 1987).

The ancillary remedy of a freeze order requires a lesser showing than that needed to obtain an injunction against future securities law violations. See SEC v. Gonzalez de Castilla, 145 F. Supp. 2d 402, 415 (S.D.N.Y. 2001) ("[C]ourts may order a freeze even where the SEC has failed to meet the standard necessary to enjoin future violations of the securities laws."). When there are concerns that defendants might dissipate assets, or transfer or secrete assets beyond the jurisdiction of the United States, this Court need only find some basis for inferring a violation of the federal securities laws in order to impose a freeze order. Id.; Unifund SAL, 910 F.2d at 1041 (upholding asset freeze order even though the evidence was insufficient to support entry of a preliminary injunction); see also SEC v. Heden, 51 F. Supp. 2d 296, 298 (S.D.N.Y. 1999); SEC v. Margolin, 1992 U.S. Dist. LEXIS 14872, **19-22 (S.D.N.Y. Sept. 30, 1992); Grossman, 1987 U.S. Dist. LEXIS 1666, **35-36.

Here, this standard is more than met. As discussed above, there is a clear and ample basis for inferring not only that the Defendant violated the federal securities laws. There also is a substantial danger that the Defendant, a citizen of Panama, is likely to remove assets beyond the jurisdiction of this Court or that he may dissipate or conceal funds in an attempt to shield those assets from the Commission and victims unless those assets are frozen. (Krause Decl. ¶¶ 56-60.) For the reasons set forth above, the Commission is likely to succeed on the merits of its case for violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Under the circumstances, an asset freeze is warranted to preserve the

15

Defendant's ability to satisfy future court-imposed remedies and to protect against the dissipation and concealment of his assets. A freeze will merely preserve the status quo, pending the Court's adjudication of the Commission's Complaint.

Additionally, the Court should order the repatriation of any funds moved offshore. <u>See</u> <u>SEC v. Shiv</u>, 379 F. Supp. 2d 609, 617 (S.D.N.Y. 2005) (Commission has "authority to obtain an order from a District Court to enjoin fraud, freeze accounts that are the instrumentalities of fraud, and repatriate funds on a ratable basis to defrauded claimants.") (citing <u>SEC v. Credit Bancorp,</u> <u>Ltd.</u>, 290 F.3d 80, 88-90 (2d Cir. 2002); <u>SEC v. AremisSoft Corp.</u>, 2002 U.S. Dist. LEXIS 15237, *2 (S.D.N.Y. Aug. 16, 2002) (court granted preliminary injunction freezing assets and directing repatriation to the territory of the United States all funds and assets resulting from stock sales); <u>SEC v. Cavanagh</u>, 1 F. Supp. 2d 337, 342 (S.D.N.Y. 1998) (court issued temporary restraining freezing assets and ordering repatriation).

## 2. **The Court Should Order an Accounting**

The reasons supporting the freeze of the Defendant's assets apply with equal force to the Commission's request for a verified accounting by the Defendant. The equitable remedy of a sworn accounting is frequently imposed to provide an accurate measure of unjust enrichment and a defendant's current financial resources. <u>See, e.g.</u>, <u>Margolin</u>, 1992 U.S. Dist. LEXIS 14872, **22-23; <u>Vaskevitch</u>, 657 F. Supp. at 316. Ampudia purchased and sold securities in his accounts and moved proceeds from those securities transactions to other accounts, making it difficult to track his proceeds and assets. (Krause Decl. ¶¶ 16-17, 58-59 & Ex. 1.) An accounting remedy is needed here to determine: (1) the amount of the Defendant's ill-gotten gains; (2) the assets available for disgorgement; and (3) whether there are additional assets that should be secured.

3.    **The Court Should Enter an Order Permitting**
      <u>**Expedited Discovery and Prohibiting The Destruction of Documents**</u>

The Commission has filed this action expeditiously and prompt resolution of the action is critical to prevent further securities violations and protect investors.  To achieve a prompt resolution, the Commission requests that expedited discovery be permitted in the manner described in the Commission's proposed order.  The Court should grant the Commission's requested for expedited discovery in order to allow the Commission to act quickly to obtain bank and other records necessary to identify and preserve assets and determine whether the Defendant is engaged in other ongoing frauds.  Given that the Commission must prepare expeditiously for an evidentiary hearing on the question whether this Court should enter a preliminary injunction, expedited discovery is appropriate.  See <u>Unifund SAL</u>, 910 F.2d at 1030; <u>SEC v. Zubkis</u>, 2003 U.S. Dist. LEXIS 16152, *20 (S.D.N.Y. Sep. 11, 2003).

Likewise, to protect the documents necessary to establish a complete record in this matter, the Commission also seeks an order preventing the destruction, alteration and concealment of documents.  Good faith preservation of documents cannot be assumed in the context of a fraudulent scheme such as this.  Accordingly, orders preventing the alteration or destruction of documents are routinely granted to protect the integrity of the litigation.  <u>See, e.g.</u>, <u>Unifund SAL</u>, 910 F.2d at 1040 n.11.  The Court should enter an order prohibiting the Defendant from destroying, altering and concealing documents in order to preserve as much of the evidence as possible given the Defendant's egregious and continuing misconduct.

## IV.
## CONCLUSION

For all the foregoing reasons, and those set forth in the accompanying declarations and exhibits thereto, the Commission respectfully requests that the Court issue the Order to Show Cause, Temporary Restraining Order, and Order Freezing Assets and Granting Other Relief in the form of the order submitted with this motion.

Dated:  April 3, 2007
New York, New York

Respectfully submitted,

Valerie A. Szczepanik (VS-0335)
Attorney for Plaintiff
Securities and Exchange Commission
3 World Financial Center, Suite 400
New York, New York  10281-1022
Tel: (212) 336-0175
Fax: (212) 336-1317
szczepanikv@sec.gov

Of Counsel:
Mark K. Schonfeld
Helene T. Glotzer
Gerald A. Gross
Sheldon Mui